(Surrogate's Court, Rensselaer County.   December, 1895.)

1. WILLS—EXECUTION—READING TO TESTATRIX.
   Where it is shown that the draftsman was engaged in the act of reading the will to testatrix, who could not read or write, and that she stated that it was "all right," and that she understood its contents, and approved of it, the court will assume that the will was read correctly.

2. SAME—PUBLICATION.
   Publication of a will is sufficiently shown by evidence that the draftsman of the will asked testatrix "if she wanted B. and him to witness the will," which was then present, and had been prepared by him in her presence, and executed by her, and that she answered in the affirmative.

3. SAME—UNDUE INFLUENCE—BURDEN OF PROOF.
   Where it appears that for 20 years testatrix had been the cook at an hotel of which the principal legatee's husband was proprietor, the burden of showing that the relation of master and servant did not exist between testatrix and the legatee is on the legatee, though testatrix was her aunt, and performed the duties of cook voluntarily, and without any contract of compensation.

4. SAME—EVIDENCE OF RELATIONSHIP.
   In such case, evidence that testatrix was never treated in the family as a servant; never ordered or directed as to her work; that no more work was required of her than she desired to do; that she performed her duties from motives of love and affection, rather than for pay; that she was treated by the legatee as a mother; that she occupied a room with the legatee's daughter, and was nursed by the family when sick,— is sufficient to show that the relation of master and servant did not exist.

Proceeding for the probate of the will of Mary Murphy, deceased. The will was dated March 31, 1890, and testatrix died February 5,

1895. She was 80 years old, and illiterate, being unable either to read or write. She left neither a husband nor descendants, but a brother, three sisters, and several nieces and nephews, among whom was proponent. Testatrix had been a cook at an hotel kept by her brother, and, on her brother's death, the hotel was taken by proponent's husband, and testatrix remained as cook, and was there about 20 years before her death. Testatrix and her husband had taken a child called Julia Murphy to live with them, but they never legally adopted the child.

Frank S. Black, for executrix, Mary Buckley, proponent, and for Ellen Murdock, Fannie Boyd, Kate Cratty, and Mary Buckley, individually.

Martin & Kelly, for John Ahearn, Elizabeth Kelly, John F. Ahearn, William H. Ahearn, Helen Grady, Agnes Frelick, and John Ahearn.

Frank T. Noonan, for Helen Grady.

LANSING, S. Two important questions are presented for decision in this case. The first relates to the execution of the will. The second involves the charge of fraud and undue influence in procuring its execution on the part of the principal beneficiary. It is claimed on the part of the contestants that the will was not properly published by the deceased, and also that the deceased was not advised of the contents of the will prior to its execution. There is no claim made that she was not a woman of fair intelligence and of sound mind, but it is claimed that, since she could neither read nor write, it was necessary for the due execution of this instrument to show that it was read to her, or, at least, that she understood its contents. This is undoubtedly the law. In re Lansing's Will (Sup.) 2 N. Y. Supp. 117. The body of the will is in the handwriting of James H. Ryan. The signature of James H. Ryan, as a witness to the will, was proven. The will was signed by the testatrix by making her mark. Peter Buckley, the sole surviving witness, testified that he signed his name to the instrument as a subscribing witness in her presence and at her request, and that he saw Mr. Ryan attach his name and make the cross between the words "Mary" and "Murphy," Mrs. Murphy touching the pen; that afterwards Mr. Ryan asked Mrs. Murphy, who was sitting at the table at his side, "if she wanted Mr. Buckley and him to witness the will, and she said, 'Yes.'" Mr. Buckley also testified that Mr. Ryan was preparing the will when he entered the sitting room, had it nearly finished, and that he saw or heard Mr. Ryan read the will to testatrix; "she said it was all right"; that, after its execution, Mr. Ryan said, "Mrs. Murphy, I will take this will, and put it in my safe." Although Mr. Buckley's testimony is not very explicit or satisfactory as to what he heard or remembered in regard to the contents of the will when he heard it read to testatrix, yet I think it appears satisfactorily that Mr. Ryan did read the will to the testatrix, and that she knew its contents prior to its execution, unless a fraud was perpetrated upon her by Mr. Ryan in failing to read some portion of

it to her, or in pretending to read what was not in the will. Mr. Ryan was a lawyer of considerable experience, and had been engaged for many years in the practice of law in Troy. There is no charge of any deception or wrongdoing upon his part in the matter, and I do not think I have the right to assume any misconduct on his part in the performance of his duty. On the other hand, I think that, when it appears that Mr. Ryan was engaged in the act of reading the will to her, I must assume that he read it correctly, and all of it, and that, when she stated it was "all right," she understood its contents, and approved of it. Buckley was not called to hear the will read, or to be advised of its contents. If I am correct in the conclusion I have drawn from this testimony in respect to the execution of the will, I think it was formally and duly executed.

It is well settled in this state that a will may be properly executed by the mark of the testator; and, where one of the subscribing witnesses is dead, his handwriting may be proved, and the testimony of the surviving witness who saw the mark made is sufficient to prove the due execution of the instrument. In re Kane's Will (Surr.) 20 N. Y. S. 123; In re Dockstader, 19 N. Y. St. Rep. 245; In re Hyland's Will (Surr.) 27 N. Y. Supp. 961; In re Wilson's Will, 76 Hun, 1, 27 N. Y. Supp. 957. No particular form of words is required to constitute the due publication and request. It is a substantial compliance with the statute if in some way or mode the testator indicates that the instrument the witnesses are requested to subscribe as such is intended and understood by him to be his will. In re Hunt's Will, 110 N. Y. 278, 281, 18 N. E. 106. The declaration may be made in answer to a question, or even to a sign. Coffin v. Coffin, 23 N. Y. 15. Publication and request may be incorporated in the same words and acts. In re Kane's Will, supra; Coffin v. Coffin, supra. The words of request or acknowledgment may proceed from another, and will be regarded as those of the testator if the circumstances show that he adopted them, and that the party speaking them was acting for him with his assent. Gilbert v. Knox, 52 N. Y. 125, 129. The publication and request are both, I think, embraced in the language which Mr. Ryan used to testatrix when he asked her "if she wanted Mr. Buckley and him to witness the will," which was then present, and had been prepared by him in her presence, and executed by her; and, if I am right in my conclusion that she knew the contents of the will, I think the will was sufficiently executed to meet the strictest requirements of the statute.

The remaining question, namely, whether this will was the result of fraud and undue influence, is the more serious one, and requires a somewhat careful examination of the evidence and the law applicable thereto. The testatrix was about 75 years of age; had received a somewhat serious injury in the breaking of her arm about a year before the making of her will; was somewhat feeble in health; but, as far as appears, was not affected by any weakness of mind or memory. The evidence tends to show that she knew who were the objects of her bounty, and that she had sufficient mind and memory to decide between them, and also knew the amount

and condition of her property. But the contestants, while not assailing the general proposition above stated, insist that the relation between the proponent and testatrix was that of master and servant; that there was dependence on the one hand, and control upon the other; and that in such a case the law will presume coercion, undue influence, or fraud unless the contrary appears by the most clear and satisfactory evidence. There is, undoubtedly, ample authority in support of this proposition if the fact shall be so found. Sears v. Shafer, 6 N. Y. 268; Ford v. Harrington, 16 N. Y. 285. They further insist that the will is an unnatural one, since the testatrix, by this instrument, gave the body of her estate to a single niece, and thereby ignored the claims of those who were the natural objects of her bounty,—her brothers and sisters; and they insist that, at least, a more wide distribution of her property among her numerous relatives, including those of a like degree of relationship as Mrs. Buckley, would have been more natural, and more in accordance with the presumed state of her affections. On the other hand, the proponent insists that the relation of master and servant, as those terms are used and that relation is understood and treated in law, did not exist between these parties; that they were kindred by blood, and that such relationship was recognized between them in their intercourse with each other, and that their relations, from their long residence together and the intimacy of their intercourse, was more like that of mother and daughter; that, at least, they were, in addition to their kinship, very close friends and associates, between whom the most confidential and affectionate relations existed; and that the relation of master and servant was not recognized by them, or either of them, and did not in fact exist between them (whatever their outward or apparent relations were), and therefore the presumptions growing out of the relation of master and servant cannot be claimed in this case. The proponent further insists that the testatrix's relations with her brothers and sisters and other relatives, except the sisters of the proponent, were neither cordial nor close, indeed were hardly friendly, and that with one of them (Mrs. Powers) she was not on speaking terms, and that the same is true of her relations with her adopted daughter, with whom she had a serious difficulty, and to whom she had not spoken for five years prior to her decease; that a knowledge of the testatrix's relations with her other kindred (aside from Mrs. Buckley and her two sisters, Mrs. Boyd, formerly Ahearn, and Mrs. Murdock) would have at once suggested the conclusion that Mrs. Buckley would be the principal recipient of her bounty.

The law applicable to the various relations between these persons, as claimed by the contending parties, is well settled. If this instrument was solely the offspring of love and affection, however the same may have been prompted or caused, it should stand as the will of the deceased. Tucker v. Tucker (Sup.) 18 N. Y. Supp. 629; Coit v. Patchen, 77 N. Y. 533, 539; In re Green, 67 Hun, 527, 22 N. Y. Supp. 1112. If, on the other hand, it was the result of dependence upon the part of the testatrix, and of control on the part of the principal beneficiary, it is, in law, the product of fraud, imposi-

tion, or coercion, and its probate should be refused. In re Green, supra; Tyler v. Gardiner, 35 N. Y. 559.

This leads us to an examination of the evidence to ascertain what was the actual relation existing between these parties (proponent and testatrix) at the time of the making of the will, for the purpose of determining (1) where the burden of proof rests in this case, and (2) of determining whether the party upon whom the burden rests has sustained the same. The testatrix lived with the proponent many years, and, doubtless, performed the duties of servant, although it appears to have been of her volition, without contract or compensation for her services. She was at the same time a friend and a relative. There was a sharp contest between these parties upon the trial as to what were the real relations between the testatrix and her niece Mrs. Buckley. The evidence upon the part of the contestant tends to show that she was a mere servant, a drudge in the kitchen, getting up early, working hard day in and day out; that she occupied the servant's quarters, was not introduced to friends of the family, did not sit at the table with the family,—in fine, was treated as a servant, and was such; that the testatrix was old, somewhat feeble in health, was ignorant, could neither read nor write, and was therefore easily the subject of fraud and imposition, and that her situation and relations with Mrs. Buckley were such as to afford her ample opportunity to alienate the affections of the testatrix from the balance of her kindred, and center them on herself; that the manner of the production of the will, as shown by the testimony, indicated fraud, if not coercion, in its production; that Mr. Ryan was comparatively a stranger to testatrix, and the will was prepared shortly after a serious quarrel with her adopted daughter in relation to the custody of the bank books; and that the proponent took advantage of the testatrix's natural resentment and of its influence over her to obtain from her this will. There is no direct evidence of any fraud or coercion in making this will, and I fail to find anything growing out of the manner of its immediate production which indicates that any undue advantage was taken of her by the proponent. It is true, Mr. Ryan was a comparative stranger to her, but she had employed him to procure her bank books from her adopted daughter, Julia Cummings, who refused to give them up. It appears that, shortly after obtaining the books, she requested Mr. Ryan, in the presence of Mr. De Groot, his clerk, to draw her will, and a few days afterwards her will was drawn under the circumstances above narrated. Mrs. Buckley appears to have been in or about the room when the will was drawn, for, when it was partially completed, she went, and called her husband, Mr. Buckley, who was asleep in another part of the house, to come and witness the will. Nothing appears from the circumstances attending the making of the will to show that the instrument was not the result of an intelligent mind, acting without restraint or undue influence. As to the relations between these parties, testatrix and proponent, it is safe to say that they were apparently those of master and servant, whatever their real relations might be. The testatrix was unlettered,

mingled but little with the world, had been in the kitchen of the proponent for 20 years. She was also quite advanced in years, had been in ill health for some time, and, under such circumstances, would, doubtless, look to Mrs. Buckley for advice and counsel.

I am of the opinion, therefore, under the circumstances, that the instrument should not be admitted to probate upon the bare proof of its formal execution, but that it was the duty of the proponent to go further, and show that, while their apparent relations were those of master and servant, their real relations were otherwise, or, at all events, that proponent had taken no advantage of her relations with testatrix; and the burden of proof, I think, was therefore upon proponent to show the will was the result of testatrix's own free act. Van Pelt v. Van Pelt, 30 Barb. 134; Loder v. Whelpley, 111 N. Y. 239, 18 N. E. 874. This proponent has essayed to do, and has introduced very considerable testimony tending to show that the relations between her and testatrix were not those of master and servant, but were those of kindred and close, intimate friendship; that the testatrix was never treated in the family as a servant; never ordered or directed as to her work; that no work was exacted of her more than she desired to do; that she performed her duties from motives of love and affection, rather than for pay; that she was counseled with, advised, and treated as a mother would have been had she been performing the same duties for her daughter; that testatrix roomed with the sisters of the proponent, and with proponent's own daughter, was nursed, when sick, by proponent and her family, and was in all respects, so far as consistent with her employment, treated as a friend and relative; that the testatrix served without compensation other than such as one member of a family would naturally give to another by presents and voluntary purchases of articles of clothing, from time to time, as affection on the one side and apparent needs upon the other prompted. The proponent also offered considerable testimony tending to show that the relations between the testatrix and her brother and sisters were not cordial; that her intercourse and association with them was infrequent; and that, with the exception of her sister in Boston (Mrs. Grady, who had a pension), they were all in comfortable circumstances. It further appears from the evidence in this case, the most cogent of which was furnished by Mrs. Boyd, a witness called by the contestants, that the relations between the testatrix and proponent were more intimate and affectionate than those between the testatrix and any of her other relatives. Indeed, Mrs. Boyd testified that she roomed with testatrix for many years when she resided with her sister, the proponent; that she learned in her intercourse with testatrix that her affections were centered upon the proponent, and that the proponent was her favorite among all her relatives; that she was also greatly attached to the proponent's family, and was exceedingly kindly treated by them. Mrs. Boyd's testimony, which appears to be frank and unbiased (since she had some reason to expect from her relations with the testatrix that she would be remembered in her will), furnishes satisfactory evidence, in connec-

tion with the other facts and circumstances in the case, that the will was made in accordance with the affections and unbiased inclination of the testatrix.

In conclusion, this instrument, following the lead of the testatrix's affections, and being the offspring of an intelligent mind, unaffected by fraud or coercion, however partial it may appear or unjust in discriminating against her other relatives, is fully established as the will of the deceased, and must be admitted to probate.

Decreed accordingly.

---

## In re BRAUNSDORF'S ESTATE.

(Supreme Court, Appellate Division, Second Department. February 11, 1896.)

1. CONSTRUCTION OF WILL—LIFE TENANT—DEDUCTION FOR REPAIRS.
   Where a widow, by the terms of a will, was entitled to the "net income" from the estate after the payment of "all necessary charges" for the proper care thereof, and the surviving children, after the death of the widow, were entitled to the whole estate, moneys paid out by the executor for repairs to buildings, and to fences and painting, should be charged to the income, and not to the principal, of the estate.

2. ESTATE IN REMAINDER—LIABILITY FOR IMPROVEMENTS.
   But moneys paid for a factory built to close up the testator's business, and which enhanced the realty for the benefit of the children, should be charged to the estate.

3. EXECUTOR — LIABILITY TO REMAINDER-MEN — COMPENSATION FOR MAINTENANCE.
   As the executor did not charge the expenses for repairs to the income, and overpaid the widow, he was entitled to deduct from the principal due to those children who had lived with their mother, and were supported by the estate, the cost of their maintenance during the lifetime of their mother.

Appeal from surrogate's court, Rockland county.